## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- X

KENNETH SALE, *individually, and on behalf of all others similarly situated*,

         Plaintiff,

    v.

BETMGM, LLC,

         Defendant.

---------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 1:23-cv-01872 (JMF)

## <u>DEFENDANT BETMGM, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION</u>

GIBSON, DUNN & CRUTCHER LLP

Christopher Chorba (*pro hac vice*)
Jeremy S. Smith (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520
CChorba@gibsondunn.com
JSSmith@gibsondunn.com

Stephanie Silvano
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035
SSilvano@gibsondunn.com

*Attorneys for Defendant BetMGM, LLC*

Dated:  June 12, 2023

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................... 1

II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY .................................. 2

    A.    BetMGM and Its Terms of Service ............................................................ 2

    B.    Mr. Sale Accepted BetMGM's Terms of Service in December 2022 ................... 4

    C.    Mr. Sale's Agreement to Arbitrate ............................................................. 5

    D.    This Lawsuit ................................................................................................ 7

III.  LEGAL STANDARD ................................................................................................. 8

IV.  ARGUMENT .............................................................................................................. 9

    A.    Mr. Sale and BetMGM Agreed to Arbitrate This Dispute on an Individual
           Basis ............................................................................................................ 9

          1.    *The Parties Have a Valid and Enforceable Agreement to Arbitrate* ......... 9

          2.    *The Court Should Enforce the Class Action Waiver* ................................ 15

          3.    *The Parties Delegated Questions of Arbitrability to the Arbitrator* ........ 16

          4.    *Even if the Court Were to Reach Issues of Arbitrability, It Should
              Still Compel Individual Arbitration.* ...................................................... 17

    B.    The Court Should Compel Arbitration and Stay the Litigation ......................... 21

V.   CONCLUSION ......................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Conn Appliances Inc.*,
    2017 WL 3315204 (D. Ariz. Aug. 3, 2017) ........................................................................18

*Allied-Bruce Terminix Cos. v. Dobson*,
    513 U.S. 265 (1995) ..............................................................................................................8

*Am. Express Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013) ..............................................................................................................9

*Arakawa v. Japan Network Grp.*,
    56 F. Supp. 2d 349 (S.D.N.Y. 1999) ..................................................................................11

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ..................................................................................................8, 14, 15

*Bassett v. Elec. Arts Inc.*,
    93 F. Supp. 3d 95 (E.D.N.Y. 2015) ....................................................................................15

*Berger v. Cantor Fitzgerald Sec.*,
    967 F. Supp. 91 (S.D.N.Y. 1997) .......................................................................................11

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
    2017 WL 7309893 (S.D.N.Y. Nov. 20, 2017), *R. & R. adopted as modified*, 2018 WL
    671258 (S.D.N.Y. Jan. 31, 2018) ..................................................................................20, 21

*Brake Masters Sys., Inc. v. Gabbay*,
    78 P.3d 1081 (Ariz. App. Ct. 2003) ....................................................................................17

*Brittain v. Twitter Inc.*,
    2019 WL 110967 (D. Ariz. Jan. 4, 2019) ............................................................................11

*Citigroup, Inc. v. Abu Dhabi Inv. Auth.*,
    776 F.3d 126 (2d. Cir. 2015) ...............................................................................................19

*Collins v. D.R. Horton, Inc.*,
    252 F. Supp. 2d 936 (D. Ariz. 2003) ...................................................................................19

*Contec Corp. v. Remote Sol., Co., Ltd.*,
    398 F.3d 205 (2d Cir. 2005) ...........................................................................................16, 17

*Cornell v. Desert Fin. Credit Union*,
    524 P.3d 1133 (Ariz. 2023) ............................................................................................10, 12

## TABLE OF AUTHORITIES
(*Cont'd.*)

**Page(s)**

*Daly v. Citigroup*,
  939 F.3d 415 (2d Cir. 2019) ................................................................................9

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985) ...........................................................................................9

*DIRECTV, Inc. v. Imburgia*,
  577 U.S. 47 (2015) ...........................................................................................14

*Drake v. Conn's HomePlus*,
  2019 WL 2568841 (D. Ariz. June 21, 2019) ....................................................16

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ......................................................................................15

*Matter of Express Indus. & Term. Corp. v. New York State Dept. of Transp.*,
  693 N.Y.S.2d 857 (N.Y. Ct. App. 1999) ...........................................................10

*Feld v. Postmates, Inc.*,
  442 F. Supp. 3d 825 (S.D.N.Y. 2020) ..........................................................12, 18

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) ........................................................................................9, 20

*FreeLife Int'l, Inc. v. Clear Perceptions Mktg.*,
  2008 WL 660065 (D. Ariz. Mar. 6, 2008) ........................................................11

*Fteja v. Facebook*,
  841 F. Supp. 2d 829 (S.D.N.Y. 2012) ..........................................................11, 14

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*,
  815 F.2d 840 (2d Cir. 1987), *abrogated on other grounds in Rodriguez–Depena v. Parts Auth., Inc.*, 877 F.3d 122 (2d Cir. 2017) ...................................................................19

*Gillman v. Chase Manhattan Bank, N.A.*,
  73 N.Y.2d 1 (N.Y. Ct. App. 1988) ................................................................20, 21

*Hall Street Assoc's, LLC v. Mattel, Inc.*,
  552 U.S. 576 (2008) ............................................................................................8

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019) .......................................................................................9, 16

*Idearc Media, LLC v. Palmisano & Assoc's, P.C.*,
  929 F. Supp. 2d 939 (D. Ariz. 2013) .................................................................12

## TABLE OF AUTHORITIES

*(Cont'd.)*

**Page(s)**

*Johnson v. Earnhardt's Gilbert Dodge, Inc.*,
132 P.3d 825 (Ariz. 2006) (en banc)......................................................................10

*Katz v. Cellco P'ship*,
794 F.3d 341 (2d Cir. 2015)......................................................................9, 18, 22

*Kindred Nursing Ctr's Ltd. P'ship v. Clark*,
581 U.S. 246 (2017)......................................................................14

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019)......................................................................14

*Leo India Films Ltd. v. GoDaddy.com LLC*,
2023 WL 3740567 (D. Ariz. May 31, 2023) ......................................................20, 21

*Libasci v. Singares*,
9 N.Y.S.3d 715 (N.Y. App. Div. 3d Dep't 2015) ......................................................10

*Long v. Amway Corp.*,
306 F. Supp. 3d 601 (S.D.N.Y. 2018)......................................................................17

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995)......................................................................15

*Meyer v. Uber Techs.*,
868 F.3d 66 (2d Cir. 2017)......................................................11, 12, 13, 14

*Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)......................................................................19

*Nayal v. HIP Network Servs. IPA, Inc.*,
620 F. Supp. 2d 566 (S.D.N.Y. 2009)......................................................20, 21

*New Pueblo Constructors, Inc. v. Lake Patagonia Recreation Ass'n*,
467 P.2d 88 (Ariz. App. Ct. 1970)......................................................................19

*Oldroyd v. Elmira Sav. Bank, FSB*,
134 F.3d 72 (2d. Cir. 1998)......................................................................18

*PaineWebber Inc. v. Bybyk*,
81 F.3d 1193 (2d. Cir. 1996)......................................................................16

*Peak v. Forever Living Prod. Int'l, Inc.*,
2011 WL 13174334 (D. Ariz. Sept. 30, 2011)......................................................15

*Peiran Zheng v. Live Auctioneers LLC*,
2021 WL 2043562 (S.D.N.Y. May 21, 2021) ......................................................13

# TABLE OF AUTHORITIES
## (*Cont'd.*)

**Page(s)**

*Perry v. NorthCentral Univ., Inc.*,
  2011 WL 4356499 (D. Ariz. Sept. 19, 2011)..........................................................................21

*Plazza v. Airbnb, Inc.*,
  289 F. Supp. 3d 537 (S.D.N.Y. 2018)....................................................................................10

*PPG Indus., Inc. v. Pilkington*
  *plc*, 825 F. Supp. 1465 (D. Ariz. 1993).................................................................................18

*Register.com v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004)...........................................................................................10, 11

*Rent-A-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010)...................................................................................................................17

*Russ v. United Serv. Auto. Ass'n*,
  2017 WL 1953458 (D. Ariz. May 11, 2017) ..........................................................................21

*Scott-Ortiz v. CBRE Inc.*,
  501 F. Supp. 3d 717 (D. Ariz. 2020) ..............................................................................13, 20

*Sena v. Uber Techs. Inc.*,
  2016 WL 1376445 (D. Ariz. April 7, 2016) .....................................................................14, 18

*Shelby v. Brookdale Senior Living, Inc.*,
  2022 WL 1657245 (9th Cir. May 25, 2022) ...........................................................................20

*Southland Corp. v. Keating*,
  465 U.S. 1 (1984)......................................................................................................................18

*People ex rel. Spitzer v. Direct Revenue, LLC*,
  862 N.Y.S.2d 816, 2008 WL 1849855 (N.Y. Sup. Ct. Mar. 12, 2008) ...................................14

*State v. Wollowitz*,
  468 N.Y.S.2d 131 (N.Y. App. Div. 2d Dep't 1983) ...............................................................20

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010).....................................................................................................................9

*Tresona Multimedia LLC v. Legg*,
  2015 WL 470228 (D. Ariz. Feb. 4, 2015)...............................................................................11

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  464 F. Supp. 3d 634 (S.D.N.Y. 2020)................................................................................11, 14

*Vargas v. Bay Terrace Plaza LLC*,
  378 F. Supp. 3d 190 (E.D.N.Y. 2019) ....................................................................................18

# TABLE OF AUTHORITIES
### (*Cont'd.*)

**Page(s)**

*Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
   489 U.S. 468 (1989)..................................................................................................15

## STATUTES

9 U.S.C. § 2..............................................................................................................8

9 U.S.C. § 3............................................................................................................21

## OTHER AUTHORITIES

G. Wilner, 1 Domke on Commercial Arbitration § 12.02 (rev. ed. Supp. 1993) .........................20

JAMS Streamlined Arbitration Rules and Procedures R. 8(b), *available at*
   https://www.jamsadr.com/rules-streamlined-arbitration/ .....................................7, 17

## TREATISES

Restatement (Second) of Contracts § 17(1) ...............................................10

Restatement (Second) of Contracts § 19(2) ...............................................10

Restatement (Second) of Contracts § 19(3) ...............................................10

## I.    INTRODUCTION

Plaintiff Kenneth Sale is a patron of BetMGM, LLC, a leading sports betting and online gaming technology company.  In December 2022, Mr. Sale created an account and used BetMGM's online gaming services through the company's Arizona platform.  Shortly thereafter, he placed and lost a $10 wager.  Three months later, Mr. Sale filed a nationwide putative class action against BetMGM, launching a host of meritless consumer protection claims concerning BetMGM's sign-up promotions and marketing materials.  But the Court should not wade into the merits of Mr. Sale's claims because they belong in binding arbitration.

To access and use BetMGM's services, Mr. Sale was required to register his account through BetMGM's website or mobile application.  The sign-up process required Mr. Sale to "**confirm that you've read the terms of service**" (in bolded text), and affirmatively check a box indicating that he "read and agree[d] to be legally bound by the Terms of Service" (which were available through hyperlinked text).  These Terms include a broad arbitration agreement, in which Mr. Sale agreed to arbitrate:

> any claims which are not resolved by [BetMGM's informal dispute resolution process], and all other actions or proceedings arising in connection with, touching upon, or relating to these terms, the service(s) (including the gaming services), the platforms, wagering transactions, the site, the app, or the alleged breach of these Terms of Service[.]

Mr. Sale also agreed that any dispute would "be submitted to Judicial Arbitration and Mediation Services for final and binding individual arbitration," in addition to agreeing to a broad class action waiver.  Neither federal nor state law permits Mr. Sale to circumvent his contractual obligations, and the Court should compel arbitration.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   BetMGM and Its Terms of Service

BetMGM, LLC is an online gaming company that provides leading sports and betting experiences.  As explained in greater detail below and in the accompanying Declaration of Sarah Brennan, to create an account, all patrons—including Mr. Sale—must complete a sign-up flow. When visiting the BetMGM website (www.betmgm.com) through a browser or the BetMGM app, the patron will arrive at BetMGM's landing page which lists the states where BetMGM's products and services are available.  To register an account with BetMGM, patrons must select the appropriate state-specific platform to play (Fig. 1; *see also* Dkt. 4 ¶ 44 (acknowledging BetMGM's "sign-up process" is available on both "BetMGM's mobile app and online website")).[1]  After making this selection, the patron faces a link to "Register" for a BetMGM account in the top righthand corner (Fig. 2).  Clicking "Register" activates the account sign-up flow, where the patron is prompted to provide personal information that is necessary for BetMGM to provide its services. This includes providing information such as the patron's email address (Fig. 3), password (Fig. 4), legal name (Fig. 5), the last four digits of a Social Security Number (Fig. 6), date of birth (Fig. 7), mobile telephone number (Fig. 8), and residential address (Fig. 9):

---

[1]  The screenshots below and in Exhibit A attached to the declaration of Sarah Brennan are taken from the sign-up flow for BetMGM accounts created on BetMGM's Arizona platform and reflect what Mr. Sale would have seen when he signed-up for a BetMGM account in December 2022.  (Brennan Decl. ¶ 13.)





(Brennan Decl., Ex. A.)

Finally, the last step of the sign-up flow (Fig. 10) starts with large bolded text instructing the patron to "**confirm that you've read the terms of service below**." The patron is then prompted to check a box confirming he / she is over 21 years of age, check a box declaring the information he / she provided is accurate, and check a box attesting: "I have read and agree to be legally bound by the <u>Terms of Service</u>[.]"



(*Id*.)  When clicked, the underlined "Terms of Service" text opens a new window showing the full text of the Terms of Service.  A patron may not proceed to create an account or use BetMGM's services, including placing wagers, without first having checked all three boxes and clicking on the green "Create My Account" button.  (Brennan Decl. ¶ 6.)

BetMGM maintains records showing the date and time of each patron's acceptance of the Terms of Service and any acknowledgement of updated Terms of Service.  (*Id.* ¶ 11.)  A copy of the current Terms of Service was (and is) also available through a link on the BetMGM platform, accessible at any time.  (*Id.* ¶ 8.)

## B.    Mr. Sale Accepted BetMGM's Terms of Service in December 2022

Mr. Sale alleges that he signed up for and used BetMGM services late last year, when he deposited and wagered $10 on the BetMGM platform.  (Dkt. 4 ¶ 56; *see also id.* ¶¶ 47, 49, 55,

56, 59.)  As confirmed in BetMGM's records, Mr. Sale registered his BetMGM account through its Arizona platform on December 1, 2022, affirmatively accepting BetMGM's Terms of Service when he completed the sign-up flow depicted above.  (Brennan Decl. ¶¶ 11–13, Ex. C [BetMGM Arizona's Terms of Service (November 1, 2022)].)  From December 1 to January 24, 2023, Mr. Sale logged on to BetMGM's platform several times.  (*Id.* ¶ 14.)  During his most recent visit in January, Mr. Sale accepted an updated version of BetMGM's Terms of Service when prompted (Fig. 11), which included the exact same arbitration and class action waiver provisions that Mr. Sale accepted on December 1, 2022.  (Brennan Decl. ¶¶ 14–17, Ex. B [Screenshot of Updated Terms of Service Notice], Ex. D [BetMGM Arizona's Updated Terms of Service].)



### C.  Mr. Sale's Agreement to Arbitrate

The Terms of Service Mr. Sale assented to contain a broad agreement to arbitrate any claims that could not be resolved through BetMGM's informal dispute resolution process.  The very first paragraph of the Terms alerts patrons to the impact of accepting the agreement,

instructing in capitalized text to "READ THE TERMS OF SERVICE CAREFULLY BEFORE

ACCEPTING," and "PRINT THESE TERMS OF SERVICE AND STORE THEM."  (*Id.*, Exs.

C, D at 1.)  The second paragraph of the Terms of Service also alerts all readers of the arbitration

provision, located in Section 28 of the Terms, in capitalized and bolded text, stating:

> **THESE AGREEMENTS CONTAIN AN ARBITRATION PROVISION
> REQUIRING BOTH PARTIES TO RESOLVE ALL DISPUTES ON AN
> INDIVIDUAL BASIS, TO THE FULLEST EXTENT PERMITTED BY
> LAW, IN FINAL AND BINDING ARBITRATION, UNLESS YOU OPT
> OUT . . . BY ACCEPTING THESE AGREEMENTS, YOU AFFIRM THAT
> YOU HAVE READ AND UNDERSTOOD ALL PROVISIONS OF THE
> AGREEMENTS, INCLUDING THE ARBITRATION PROVISION
> LOCATED IN SECTION 28.**

(*Id.*)

Section 28 of the Terms contains the arbitration agreement.  At the beginning of the

section, in bolded and capitalized text, patrons are instructed to "**PLEASE READ THIS**

**SECTION CAREFULLY**" because **"IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL**

**RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT**."  (Brennan

Decl., Exs. C, D § 28 (emphasis in original).)  The arbitration provision then provides:

> PURSUANT TO THE FEDERAL ARBITRATION ACT, **ANY CLAIMS**
> WHICH ARE NOT RESOLVED BY THE [INFORMAL DISPUTE
> RESOLUTION PROCESS], AND **ALL OTHER ACTIONS OR**
> **PROCEEDINGS ARISING IN CONNECTION WITH**, **TOUCHING UPON**,
> **OR RELATING TO** THESE TERMS, THE SERVICE(S) (INCLUDING THE
> GAMING SERVICES), THE PLATFORMS, WAGERING TRANSACTIONS,
> THE SITE, THE APP, OR THE ALLEGED BREACH OF THESE TERMS OF
> SERVICE ("DISPUTES"), **SHALL BE SUBMITTED TO JUDICIAL**
> **ARBITRATION AND MEDIATION SERVICES ("JAMS") FOR FINAL**
> **AND BINDING INDIVIDUAL ARBITRATION UNDER ITS**
> **STREAMLINED ARBITRATION RULES AND PROCEDURES**.

(*Id.* § 28.5.1 (emphases added).)

The Terms of Service also include a broad class action waiver, in which Mr. Sale agreed

"that any and all Disputes arising between" him "and BetMGM shall be arbitrated only on an

6

individual basis, and not on a class, collective, and/or representative basis." (*Id.* § 28.7.1.)  In full, the class action waiver provides:

> You and BetMGM agree that any and all Disputes arising between You and BetMGM shall be arbitrated only on an individual basis, and not on a class, collective, and/or representative basis. There will be no right or authority for any dispute to be brought, heard or arbitrated as a class action, collective action, and/or representative action, and the arbitrator will have no authority to hear or preside over any such action ("Class, Collective, and Representative Action Waivers"). For avoidance of doubt, regardless of the forum in which You or BetMGM brings or seeks to bring claims, You and BetMGM agree to bring claims only in their individual capacities and not as a plaintiff or class member of any purported class or collective proceeding, and not on behalf of any other person.

(*Id.* § 28.7.1.)

Additionally, the Terms of Service contain a broad delegation provision, but carves out the class waiver:

> [A]ll disputes regarding whether this arbitration agreement is unenforceable, unconscionable, applicable, valid, void or voidable, and all disputes regarding the scope of the arbitration agreement, shall be determined exclusively by an arbitrator, and not by any court.

(*Id.* § 28.4.2.)

The arbitration agreement within the Terms also explicitly incorporates the JAMS Streamlined Arbitration Rules and Procedures.  (*Id.* §§ 28.5.1, 28.5.3.)  Those Rules provide that, "[t]he Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter[,]" including "disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought."   JAMS Streamlined Arbitration Rules and Procedures R. 8(b), *available at* https://www.jamsadr.com/rules-streamlined-arbitration/.

**D.     This Lawsuit**

Mr. Sale filed his Complaint in this Court on March 6, 2023.  (Dkt. 4.)  He alleges that BetMGM violated state consumer protection law through alleged bet promotions that have

"persuad[ed] Plaintiff and other Americans to open and use betting accounts." (*Id*. ¶ 13.)  Mr. Sale claims that he was "seduced into gambling" through alleged offers of "free" or "risk-free" wagers. (*Id.* ¶ 14.)  He does not allege that he contacted BetMGM in an attempt to resolve his dispute before filing this lawsuit.  He also does not allege that he sought arbitration of his claims (as he agreed to do when registering for an account).

Instead, Mr. Sale asserts claims for negligent misrepresentation, intentional misrepresentation, fraudulent inducement, and "quasi contract / unjust enrichment / restitution" on behalf of a putative nationwide class.  (*Id.* ¶¶ 79–116.)  On behalf of a putative New York class, Mr. Sale also alleges violations of New York General Business Law §§ 349 and 350.  (*Id.* ¶¶ 68–78.)  The putative classes are defined as "[a]ll persons who signed up for a 'free bet,' 'risk-free' bet or similar promotion with Defendant and lost any portion of their first bet."  (*Id.* ¶ 59.)

Before filing this motion, the parties' counsel met and conferred via Zoom.  Dkt. 12. BetMGM's counsel explained that Mr. Sale had agreed to a valid arbitration agreement and showed the sign-up flow Mr. Sale would have seen when he registered an account with BetMGM. Mr. Sale did not agree to submit his claims to arbitration.  Accordingly, BetMGM brings this motion to compel arbitration.

### III.    LEGAL STANDARD

The Federal Arbitration Act "embod[ies] a national policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011).  This policy "replace[d] judicial indisposition to arbitration."  *Hall Street Assoc's, LLC v. Mattel, Inc*., 552 U.S. 576, 581 (2008) (citation omitted).  And the FAA governs this motion because the Terms of Service are a "contract evidencing a transaction involving commerce."  9 U.S.C. § 2; *see also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273–74 (1995).

"'By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration[.]'" *Daly v. Citigroup*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original)).  Courts must therefore "rigorously enforce arbitration agreements according to their terms."  *Am. Express Co. v. Italian Colors Rest*., 570 U.S. 228, 233 (2013) (internal citation omitted).  And the parties should be ordered to proceed in arbitration on an individual basis unless the agreement expressly calls for class arbitration.  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp*., 559 U.S. 662, 687 (2010).

Courts must stay litigation and compel arbitration of claims covered by a written, enforceable arbitration agreement.  *See Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015).

## IV.    ARGUMENT

### A.    Mr. Sale and BetMGM Agreed to Arbitrate This Dispute on an Individual Basis

Under the FAA, this Court need decide only a single issue here:  whether there is a valid agreement to arbitrate Mr. Sale's claims on an individual basis.  *See Henry Schein, Inc. v. Archer & White Sales, Inc*., 139 S. Ct. 524, 529 (2019).  Mr. Sale agreed to a valid class action waiver, prohibiting his putative class action suit.  And because there is a binding agreement to arbitrate, there is no need to examine any other issues, such as the scope of the arbitration clause or potential defenses, because the parties expressly chose to delegate all of those issues to the arbitrator.  *Id.*

#### 1.    *The Parties Have a Valid and Enforceable Agreement to Arbitrate*

Federal courts determine the validity of an arbitration agreement by "apply[ing] ordinary state-law principles that govern the formation of contracts."  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Although courts often initially examine the forum state's

law, BetMGM's Terms of Service provide that "Arizona law governing arbitration agreements

shall apply" to the "enforceability, application, and interpretation of this arbitration agreement."

(Brennan Decl., Exs. C, D § 28.4.1.)  But here, it does not matter whether New York or Arizona

law applies because under both New York and Arizona law a valid agreement to arbitrate exits.

"Although the Internet age has certainly introduced new twists with regard to entering

into contracts, the fundamental elements of contract law, including mutual assent of the parties,

have not changed."  *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 547 (S.D.N.Y. 2018) (applying

California law but noting "New York law is substantively similar"); *Register.com v. Verio, Inc.*,

356 F.3d 393, 403 (2d Cir. 2004) (materially similar).  "'To create a binding contract, there must

be [1] a manifestation of mutual assent sufficiently definite to assure that the parties are truly in

agreement with respect to all material terms' and [2] consideration[.]"  *Libasci v. Singares*, 9

N.Y.S.3d 715, 717 (N.Y. App. Div. 3d Dep't 2015) (quoting *Matter of Express Indus. & Term.

Corp. v. New York State Dept. of Transp.*, 693 N.Y.S.2d 857, 860 (N.Y. Ct. App. 1999)); *accord

Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 132 P.3d 825, 828 (Ariz. 2006) (en banc) (Under

Arizona law, "a contract is 'a bargain in which there is a manifestation of mutual assent to the

exchange and a consideration.'" (quoting Restatement (Second) of Contracts § 17(1))).  There is

both mutual assent and consideration here:

[1] <u>Mutual Assent</u>:  First, assent may take the form of words, action, or even "'silence or

inaction[,]'" *Register.com*, 356 F.3d at 403 (quoting Restatement (Second) of Contracts § 19(2)),

and "a person can manifest assent to contractual terms even without actual notice of those

terms," *Plazza*, 289 F. Supp. 3d at 548; *see also Cornell v. Desert Fin. Credit Union*, 524 P.3d

1133, 1140 (Ariz. 2023) ("The conduct of a party may manifest assent even though he does not

in fact assent." (citing Restatement (Second) § 19(3))).  Here, Mr. Sale assented to BetMGM's

Terms of Service when he signed up for BetMGM's betting and gaming services through its Arizona platform.  When registering for his account, Mr. Sale was required to affirmatively check a box indicating that he had "read and agree[d] to be legally bound by the Terms of Service" before being able to "Create My Account."  (Brennan Decl. ¶¶ 6–7.)

This "clickwrap" agreement, in which Mr. Sale was "force[d] to expressly and unambiguously manifest either assent or rejection prior to being given access to the product[,]" *Register.com.*, 356 F.3d at 429, is "routinely enforced" under New York and Arizona Law, *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) (citing *Meyer v. Uber Techs.*, 868 F.3d 66, 75 (2d Cir. 2017) (applying California law but noting New York law is "substantially similar")).  *Accord FreeLife Int'l, Inc. v. Clear Perceptions Mktg.*, 2008 WL 660065, at *2 (D. Ariz. Mar. 6, 2008) (finding a patron of plaintiff's website agreed to a contract where he "click[ed] the 'I accept' box to confirm his consent to be bound by [p]laintiff's policies and procedures"); *Brittain v. Twitter Inc.*, 2019 WL 110967, at *1 (D. Ariz. Jan. 4, 2019) (materially similar).  "Courts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract," *Meyer*, 868 F.3d at 75, and "courts have not hesitated in applying the terms," *Fteja v. Facebook*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012); *accord Tresona Multimedia LLC v. Legg*, 2015 WL 470228, at *12 (D. Ariz. Feb. 4, 2015) (enforcing forum selection clause where plaintiff "clicked a box stating 'I agree to the terms'" and "[a] hyperlink to the User Agreement was included on the page").

Mr. Sale cannot avoid the Terms of Service by claiming he never read them.  "'[A] person who signs a contract is presumed to know its contents and assent to them.'"  *Arakawa v. Japan Network Grp.*, 56 F. Supp. 2d 349, 352 (S.D.N.Y. 1999) (quoting *Berger v. Cantor*

*Fitzgerald Sec.*, 967 F. Supp. 91, 93 (S.D.N.Y. 1997)); *Idearc Media, LLC v. Palmisano & Assoc's, P.C.*, 929 F. Supp. 2d 939, 945 (D. Ariz. 2013) (materially similar).

 Mr. Sale cannot reasonably contest that he was unaware of the Terms of Service either. "Where . . . an offeree claims not to have actual notice of the terms of the contract, the question becomes whether a reasonably prudent person would have been on inquiry notice of the terms such that the offeree would still be bound by the contract." *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 829–30 (S.D.N.Y. 2020) (citing *Meyer*, 868 F.3d at 76); *see also Cornell*, 524 P.3d at 1139–40 (adopting reasonable notice requirement for modified contract terms). "Inquiry notice depends on the 'clarity and conspicuousness of arbitration terms.'" *Feld*, 442 F. Supp. 3d at 829–30 (citing *Meyer*, 868 F.3d at 76).

 Here, BetMGM provided Mr. Sale with clear and conspicuous notice of the Terms. The final step of the sign-up flow process featured in the largest text on the screen, in bold type, flushed center, and at the top: "**confirm that you've read the terms of service below[.]**" (Brennan Decl., Ex. A.) The larger text, coupled with the bold type-face and its central location at the top of the screen, along with the message of the text itself that Mr. Sale must "**confirm**" that he "**read the terms of service below**," "signal[ed]" to Mr. Sale that his "acceptance of the benefit of registration would be subject to contractual terms." *Meyer*, 868 F.3d at 79.



The Terms of Service hyperlink appeared below the bolded language, in the same window, immediately next to the box Mr. Sale clicked upon to confirm he "read and agree[d] to be legally bound by the Terms of Service." (Brennan Decl., Ex. A.) The "Terms of Service" phrase is both capitalized and underlined, "clearly indicating to a reasonably prudent internet user that those terms were hyperlinked" and clicking on the text would take Mr. Sale to the full text of BetMGM's Terms of Service. *Peiran Zheng v. Live Auctioneers LLC*, 2021 WL 2043562, at *5 (S.D.N.Y. May 21, 2021) (slip op.). There can be no dispute that "a reasonably prudent [ ] user knows" "underlined" text "is hyperlinked to another webpage where additional information will be found." *Meyer*, 868 F.3d at 77–78; *see also Scott-Ortiz v. CBRE Inc.*, 501 F. Supp. 3d 717, 725–26 (D. Ariz. 2020) (rejecting challenge to arbitration agreement where

"[t]here was no unfair surprise or fine print[,]" the "arbitration clause was clearly marked[,]" and the plaintiff had to "affirmatively verify that he was accepting the . . . terms").[2]

Courts have enforced contracts where the notice provided to the signatory is far less conspicuous than here.  Another court in this District compared the enforceability of terms of service located via hyperlink to the fine print located on the back of a cruise ticket and on the back of a sign on a bin of apples, explaining:  "[t]here is no reason why th[e] outcome should be different because [the] Terms of Use appear on another screen rather than another sheet of paper. What is the difference between a hyperlink and a sign on a bin of apples saying 'Turn Over for Terms' or a cruise ticket saying 'SUBJECT TO CONDITIONS OF CONTRACT ON LAST PAGES IMPORTANT!'"  *Fteja*, 841 F. Supp. 2d at 839 (emphasis in original); *see also Sena v. Uber Techs. Inc.*, 2016 WL 1376445, at *6 (D. Ariz. April 7, 2016) (finding arbitration terms were "conspicuous" where they were highlighted on the first page of the arbitration provision).

Requiring more would therefore violate not only New York and Arizona law, but the FAA as well.  This federal law "requires courts to place arbitration agreements 'on equal footing with all other contracts.'"  *Kindred Nursing Ctr's Ltd. P'ship v. Clark*, 581 U.S. 246, 248 (2017) (quoting *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 48 (2015)); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) ("[S]tate law is preempted to the extent it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of the FAA." (quoting *Concepcion*, 563 U.S. at 352 (internal citations omitted))).

---

[2] Nor can Mr. Sale claim that he lacked reasonable notice of the arbitration provisions in the Terms of Service merely because they were available via a hyperlink.  "Although a clickwrap agreement's terms and conditions must be clear and conspicuous, they need not all be simultaneously and immediately visible[.]"  *Valelly*, 464 F. Supp. at 640 (S.D.N.Y. 2020); *see also Meyer*, 868 F.3d at 75–78.  "[A] separate hyperlink leading to the agreement" is "sufficient" for assent.  *People ex rel. Spitzer v. Direct Revenue, LLC*, 862 N.Y.S.2d 816, 2008 WL 1849855, at *4 (N.Y. Sup. Ct. Mar. 12, 2008).

[2]  Adequate Consideration.  In addition to mutual assent, there was adequate

consideration for the arbitration agreement that binds Mr. Sale in this case.  "Mutual promises to

arbitrate," "while not necessary as consideration to support an agreement to arbitrate" are

"sufficient . . . to support an arbitration agreement." *Bassett v. Elec. Arts Inc.*, 93 F. Supp. 3d 95,

104 (E.D.N.Y. 2015) (collecting cases); *accord Peak v. Forever Living Prod. Int'l, Inc.*, 2011

WL 13174334, at *4 (D. Ariz. Sept. 30, 2011) ("[A] mutual promise to submit disputes to

arbitration . . . is sufficient consideration.").  That is the exact case here.  Both BetMGM and its

patrons, like Mr. Sale, agreed to submit their disputes to arbitration.

### 2.  *The Court Should Enforce the Class Action Waiver*

Because there was mutual assent and consideration, there is a binding contract between

Mr. Sale and BetMGM.  And that binding contract specifically requires individual arbitration.

It is well settled that class-action waivers in arbitration agreements governed by the FAA

are valid and enforceable.  The "primary purpose" of the FAA is "ensuring that private

agreements to arbitrate are enforced according to their terms." *Volt Info. Scis. v. Bd. of Trs. of*

*Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) (emphasis added); *see also*

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 53–54 (1995) (enforcement of

arbitration agreements "according to their terms" is the "central purpose" of the FAA);

*Concepcion*, 563 U.S. at 344 (same).  This includes "terms providing for individualized

proceedings." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018).  Here, the class-action

waiver in the parties' arbitration agreement specifically prohibits claims from being arbitrated

"on a class, collective, and/or representative basis."  (Brennan Decl., Exs. C, D § 28.7.1.)

Accordingly, Mr. Sale should be compelled to arbitrate his claims on an individual basis.

### 3.      *The Parties Delegated Questions of Arbitrability to the Arbitrator*

The Terms delegate all remaining questions about the scope and validity of the arbitration agreement to the arbitrator.  Under the FAA, parties to an arbitration agreement may agree to have "an arbitrator, rather than a court . . . resolve threshold arbitrability questions as well as underlying merits disputes."  *Henry Schein*, 139 S. Ct. at 527.  Where the parties have agreed to delegate "gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy . . . a court possesses no power to decide the arbitrability issue."  *Id.* at 529 (cleaned up).

Here, the Terms of Service delegated issues regarding enforceability, validity, scope, or applicability of the arbitration agreement exclusively to the arbitrator:  the Terms require "*all disputes* regarding whether this arbitration agreement is unenforceable, unconscionable, applicable, valid, void or voidable, and *all disputes* regarding the scope of this arbitration agreement" to be "determined exclusively by an arbitrator, and not by any court."  (Brennan Decl., Exs. C, D, § 28.4.2 (emphases added).)  Courts routinely hold that such language clearly and unmistakably evinces an intent to delegate questions of arbitrability—including applicability, validity, enforceability, and scope—to the arbitrator.  *See, e.g.*, *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199–1200 (2d. Cir. 1996) (finding parties intended to arbitrate issues of arbitrability where they agreed "any and all controversies . . . shall be determined by arbitration."); *see also Drake v. Conn's HomePlus*, 2019 WL 2568841, at *2 (D. Ariz. June 21, 2019) (finding "clear and unmistakable evidence" that parties "expressly agreed to delegate the issue of arbitrability to the arbitrator" where arbitration agreement stated "it '[c]overs any dispute concerning the arbitrability of any such controversy or claim'").

Because "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement" the "FAA operates on [it] just as it does on any other." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 (2010). The Court therefore must enforce the delegation provision and send all questions of arbitrability to the arbitrator. *See Long v. Amway Corp.*, 306 F. Supp. 3d 601, 610 (S.D.N.Y. 2018) (finding delegation provision "valid and enforceable" and concluding "the antecedent issue of . . . arbitrability" must "proceed before an arbitrator.").

The parties' agreement to delegate threshold questions of arbitrability to an arbitrator is further confirmed by the Terms of Service's incorporation of the JAMS arbitration rules. (Brennan Decl., Exs. C, D § 28.5.1.) The JAMS rules provide that the arbitrator—and not the court—must decide all arbitrability disputes:

> Jurisdictional and arbitrability disputes, including ***disputes over the formation, existence, validity, interpretation or scope of the agreement*** under which Arbitration is sought, and who are proper Parties to the Arbitration, ***shall be submitted to and ruled on by the Arbitrator***. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

JAMS Streamlined Arbitration Rules and Procedures R. 8(b), *available at* https://www.jamsadr.com/rules-streamlined-arbitration/ (emphases added). Incorporating the JAMS rules independently delegates the issue of arbitrability to the arbitrator. *See Contec Corp.*, 398 F.3d at 208 ("[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *accord Brake Masters Sys., Inc. v. Gabbay*, 78 P.3d 1081, 1088 (Ariz. App. Ct. 2003) (materially similar).

### 4. *Even if the Court Were to Reach Issues of Arbitrability, It Should Still Compel Individual Arbitration.*

Given that Mr. Sale formed an arbitration agreement with BetMGM, agreed to a class action waiver, and agreed to delegate any questions regarding arbitrability to the arbitrator, he

cannot now "ignore the contract and resort to the courts." *Southland Corp. v. Keating*, 465 U.S. 1, 7 (1984). The delegation clause and the incorporation of the JAMS Rules independently and collectively mean "challenges" to arbitrability "must, therefore, be addressed by an arbitrator in the first instance." *Vargas v. Bay Terrace Plaza LLC*, 378 F. Supp. 3d 190, 197 (E.D.N.Y. 2019); *accord Adams v. Conn Appliances Inc.*, 2017 WL 3315204, at *6 (D. Ariz. Aug. 3, 2017). But even if the Court considers questions of arbitrability, it still should grant this Motion. Mr. Sale's claims fall within the scope of the arbitration clause, and there are no grounds—like unconscionability—that would make the clause unenforceable.

The arbitration agreement that Mr. Sale accepted broadly covers "any claims, complaints or disputes with or regarding BetMGM in connection with Your use of the Platform or the Services[,]" (Brennan Decl., Exs. C, D § 28.1), "which are not resolved by the [informal dispute resolution process]" and "all other actions or proceedings arising in connection with, touching upon, or relating to these terms, the service(s) (including the gaming services), the platforms, wagering transactions, the site, the app, or the alleged breach of these Terms of Service[,]" (Brennan Decl., Exs. C, D § 28.5.1 (emphasis removed).) Such language "represent[s] the prototypical broad arbitration provision." *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d. Cir. 1998) (finding "[a]ny dispute, controversy or claim arising under or in connection with this Agreement shall be settled exclusively by arbitration" a broad arbitration provision), *abrogated on other grounds in Katz*, 794 F.3d 341; *see also PPG Indus., Inc. v. Pilkington plc*, 825 F. Supp. 1465, 1478 (D. Ariz. 1993) (similar). Therefore, Mr. Sale's claims are "presumptively within the scope of the arbitration clause" contained in the Terms. *Oldroyd*, 134 F.3d at 77; *Feld*, 442 F. Supp. 3d at 833 (materially similar); *accord Sena*, 2016 WL 1376445, at *2 (materially similar).

In other words, should the Court consider arbitrability issues (which it should not), Mr. Sale cannot avoid the broad language of the arbitration agreement.  To determine "whether a particular claim falls within the scope of the parties' arbitration agreement," New York and Arizona courts focus on whether "the allegations underlying the claims 'touch matters' covered by the parties' [contracts]."  *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir. 1987), *abrogated on other grounds in Rodriguez–Depena v. Parts Auth., Inc.*, 877 F.3d 122 (2d Cir. 2017), (quoting *Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624–25 n.13 (1985)); *accord Collins v. D.R. Horton, Inc.*, 252 F. Supp. 2d 936, 940 (D. Ariz. 2003) (materially same).

Mr. Sale's claims "touch matters" covered by the parties Terms.  The core of Mr. Sale's allegations is BetMGM allegedly misrepresented Mr. Sale's ability to make "risk-free" wagers on BetMGM's platform and he lost money as a result.  (*See, e.g.*, Dkt. 4 ¶¶ 55–57).  The arbitration provisions encompass any claims "relating to . . . the services(s) (including the gaming services), the platforms, wagering transactions, the site" and "the app."  (Brennan Decl., Exs. C, D § 28.5.1.)  Mr. Sale's allegations fall squarely within such language.

Even if a doubt were to remain (and there is none), "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]"  *Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 130 (2d. Cir. 2015) (internal quotation marks omitted); *accord New Pueblo Constructors, Inc. v. Lake Patagonia Recreation Ass'n*, 467 P.2d 88, 91 (Ariz. App. Ct. 1970) ("[A]rbitration clause[s] should be construed liberally and any doubts as to whether or not the matter in question is subject to arbitration should be resolved in favor of arbitration.").  That is, "issues will be deemed arbitrable unless 'it is clear that the arbitration clause has *not* included'

them." *First Options*, 514 U.S. at 945 (quoting G. Wilner, 1 Domke on Commercial Arbitration § 12.02 (rev. ed. Supp. 1993)) (emphasis added).

Nor can Mr. Sale avoid arbitration by now claiming the arbitration agreement is unconscionable.  "[A] contract is unconscionable when it is 'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.'"  *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (N.Y. Ct. App. 1988)); *see also Shelby v. Brookdale Senior Living, Inc.*, 2022 WL 1657245, at *2 (9th Cir. May 25, 2022) (explaining unconscionability is a "high bar").

No aspect of BetMGM's Terms of Service or its sign-up flow is procedurally unconscionable.  Procedural unconscionability "concerns the contract formation process and the alleged lack of meaningful choice[.]"  *Nayal*, 620 F. Supp. 2d at 571 (*State v. Wollowitz*, 468 N.Y.S.2d 131, 145 (N.Y. App. Div. 2d Dep't 1983)); *accord Scott-Ortiz*, 501 F. Supp. 3d at 725 (explaining procedural unconscionability "is concerned with 'unfair surprise,' fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should.").  As explained above (*supra* at 12–14), the hyperlink and the arbitration provisions were conspicuous, and therefore cannot be considered procedurally unconscionable.  *See Bernardino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 7309893, at *11 (S.D.N.Y. Nov. 20, 2017), *R. & R. adopted as modified*, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) ("[T]he Second Circuit's decision in *Meyer* forecloses a finding that a hyperlink to the [Terms of Use] is procedurally unconscionable."); *see also Leo India Films Ltd. v. GoDaddy.com LLC*, 2023 WL 3740567, at *4 (D. Ariz. May 31, 2023) (slip op.) (finding "complained-of terms" were not "inconspicuous" since they appeared in a "reasonable size" and featured "all capital letters under

a numbered, bold, and all-caps header"). Moreover, "even if the Agreement was a form contract offered on a 'take-it-or-leave-it' basis" this "is not sufficient . . . to render the provision procedurally unconscionable." *Nayal*, 620 F. Supp. 2d at 571 (collecting cases); *accord Perry v. NorthCentral Univ., Inc*., 2011 WL 4356499, at *4 (D. Ariz. Sept. 19, 2011) ("Under Arizona law, a contract of adhesion is presumptively valid and fully enforceable according to its terms[.]"). BetMGM is but one of many options available for online entertainment and gaming, again refuting any suggestion that Mr. Sale was left without meaningful choice in agreeing to arbitrate this dispute. *See Bernardino*, 2017 WL 7309893, at *12 ("no basis for finding [a] arbitration provision is procedurally unconscionable" where plaintiff "had other options for obtaining" defendant's services); *accord Leo India Films Ltd.*, 2023 WL 3740567, at *2 (materially similar).

Nor can Mr. Sale reasonably contend that the arbitration provisions are substantively unconscionable. Substantive unconscionability "entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman*, 73 N.Y.2d at 11; *see also Russ v. United Serv. Auto. Ass'n*, 2017 WL 1953458, at *4 (D. Ariz. May 11, 2017) (materially similar)*.* There is nothing within the Terms of Service to suggest that any of the terms favor BetMGM over Mr. Sale, let alone unreasonably favor BetMGM.

**B.      The Court Should Compel Arbitration and Stay the Litigation**

Under Section 3 of the FAA, when the Court determines that a suit should be referred to arbitration, it "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3. "While district courts no doubt enjoy an inherent authority to manage their dockets, that authority cannot

trump a statutory mandate, like Section 3 of the FAA, that clearly removes such discretion." *Katz*, 794 F.3d at 346 (internal citations omitted).  This Court should follow Section 3's command and stay Mr. Sale's lawsuit pending completion of individual arbitration.

## V.   CONCLUSION

By availing himself of BetMGM's services, Plaintiff agreed to arbitrate all claims arising from his use of those services.  BetMGM respectfully requests that this Court compel Mr. Sale to arbitrate his claims.

Dated: June 12, 2023                                  Respectfully submitted,

By:*/s/ Christopher Chorba*
    Christopher Chorba

Christopher Chorba (*pro hac vice*)
Jeremy S. Smith (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:  213.229.7000
Facsimile:  213.229.7520
CChorba@gibsondunn.com
JSSmith@gibsondunn.com

Stephanie Silvano
GIBSON, DUNN & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035
SSilvano@gibsondunn.com

*Attorneys for Defendant BetMGM, LLC*